UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| **Plaintiff,** | |
| v. | Civil Action No. 1:19-cv-8086 |
| LIVE WELL FINANCIAL, INC., | Jury Trial Demanded |
| MICHAEL C. HILD, | |
| ERIC ROHR, and | |
| DARREN STUMBERGER, | |
| **Defendants.** | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Plaintiff" or "Commission") alleges as follows:

## SUMMARY OF ACTION

1.      From approximately September 2015 through May 2019, Michael C. Hild, the CEO of Live Well Financial, Inc., a reverse mortgage originator and the owner of an investment portfolio of bonds, directed a brazen scheme to defraud Live Well's lenders through "a self-generating money machine," in Hild's words, that worked by falsely inflating the value of bonds serving as collateral for loans to Live Well.  Live Well's Chief Financial Officer, Eric Rohr, and its Portfolio Manager, Darren Stumberger, carried out the scheme with Hild.

2.      The seeds of the scheme were planted in February 2015, when Live Well, at Hild's urging, convinced the third-party pricing service upon which many of Live Well's lenders

relied to stop publishing its own independent valuations of bonds that Live Well owned or wished to purchase but, instead, to start publishing verbatim the valuations that Live Well submitted to the pricing service.  Then Live Well, at Hild's direction, sought out and entered into financing relationships with additional lenders that Live Well and Hild knew would rely on the pricing service's valuations for the bonds that would serve as the loan collateral.

3.     The scheme became fully operational in September 2015, when Live Well, Rohr, and Stumberger, at Hild's direction, began abusing Live Well's *de facto* ability to set the valuations published by the pricing service for certain bonds by submitting or causing the submission of grossly inflated valuations that Live Well then used to increase its borrowing capacity.  Through this scheme, Live Well regularly obtained financing that exceeded the full market value of the bonds that served as the collateral for the financing.

4.     Live Well, Hild, Stumberger, and Rohr knew that Live Well's lenders thought that the third-party pricing service independently determined the published values of the bonds, and that the lenders were not aware that the pricing service had become a mere pass-through for Live Well's purported valuations.

5.     In a stark illustration of this, the Defendants called an emergency meeting after one of Live Well's lenders announced that it wanted to spot-check the pricing service's published bond prices with one or more dealers.  The lender's announcement threw the Defendants into a panic because they feared it would find out that the pricing service was publishing inflated valuations, or, even worse, that the source of the inflated valuations was Live Well itself.  In the meeting, the Defendants discussed various ways to try to prevent these facts from coming to light, including by approaching a dealer who would be willing to be "slimy" for Hild by corroborating the inflated bond valuations to the lender.  In a follow-up meeting the next

day, Hild expressed reluctance to introduce the lender to one particular dealer in order to spot check a bond price because he feared that doing so would "let the genie out of the bottle."

6.       Live Well also presented its lenders with false and misleading financial statements in connection with obtaining financing.  The financial statements falsely stated that Live Well valued its portfolio according to its bonds' "exit price" and that Live Well "carries these securities at fair value derived from an independent third-party pricing service."  In fact, Live Well, with certain exceptions, used the valuations that it was sending to the pricing service—which substantially exceeded exit price or fair value—for its own books.  The Defendants were well aware that Live Well did not carry the bonds in its books at "exit price" and that the pricing service was simply acting as a pass-through for Live Well's inflated quotes.

7.       As a result of the scheme, Live Well fraudulently obtained millions of dollars in loan proceeds to which it was not entitled.  Live Well used these improperly obtained funds in part to swell the growth of its bond portfolio, generating still further ill-gotten gains in the form of interest payments on the bonds.  These ill-gotten gains were used to fund lavish compensation packages for Hild and to pay additional compensation to Rohr and Stumberger.

8.       In the eight months after Live Well began submitting inflated valuations to the pricing service, Live Well's reported value of its bond portfolio grew from $71 million to $324 million, and ten months later its reported value ballooned to $570 million.  This growth was in part the result of new bond purchases that Live Well, unbeknownst to its lenders, had made entirely with loan proceeds without contributing any of its own capital.

9.       Live Well's fraudulent mismarking scheme was highly lucrative for Live Well and Hild.  During the course of the scheme, Live Well's bond portfolio generated over $100 million in revenue from cash remittance payments, and Hild, as CEO, received more than $24

million in compensation which was funded wholly or substantially by the ill-gotten gains that Live Well obtained through its mismarking scheme.

10.     Live Well's fraudulent scheme collapsed in 2019 when Live Well's lenders sought repayment of the funds that they had loaned to Live Well.  Instead of repaying the loans, Live Well announced the cessation of its operations and stuck the lenders with tens of millions of dollars in losses.  Because Live Well had borrowed far more than what the bonds were worth, Live Well could not repay its lenders by selling the bonds or refinancing them.

11.     On July 1, 2019, Live Well was placed into involuntary Chapter 7 bankruptcy at the request of several of its lenders.

12.     In the bankruptcy proceeding, Live Well's lenders allege losses in excess of $130 million in connection with Live Well's fraudulent mismarking scheme.

13.     By engaging in the conduct alleged in this Complaint, Defendants Live Well, Hild, Rohr, and Stumberger violated and/or aided and abetted violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].  In addition, Defendant Hild is liable as a controlling person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Live Well's violations.

**JURISDICTION AND VENUE**

14.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and

courses of business of similar purport and object, for civil penalties, disgorgement plus prejudgment interest, officer and director bars, and for other equitable relief.

15.     The Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

16.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27(a) of the Exchange Act [15 U.S.C. § 78a(a)].

17.     A substantial part of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred within the jurisdiction of the United States District Court for the Southern District of New York, including but not limited to fraudulent acts and statements being made to the pricing service and the lenders within this judicial district who were involved in the transactions at issue in this case.  In addition, the pricing service was located in this judicial district and received the fraudulent bond price submissions from Live Well here, and one of Live Well's employees involved in the mismarking scheme performed his duties in this judicial district.

18.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.  Defendants, unless enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein, and in transactions, acts, practices, and courses of business of similar purport and object.

## **<u>DEFENDANTS</u>**

19.     **Live Well Financial, Inc.** ("Live Well") is a private company headquartered in Richmond, Virginia.  Live Well's principal business is the origination and servicing of reverse

mortgages.  In November 2018, Live Well sold its mortgage servicing business.  On May 3, 2019, Live Well announced that it was winding down all of its operations and terminating all of its employees.  On July 1, 2019, Live Well was placed into involuntary Chapter 7 bankruptcy and a trustee was appointed to oversee ongoing matters.

20.     **Michael C. Hild** ("Hild"), age 43, is the Chairman and Chief Executive Officer of Live Well.  Hild owns the majority of the common stock of the company, the balance of which is owned by a group of his family and friends.  Hild is also one of two directors on Live Well's board of directors.  Hild lives in Richmond, Virginia.

21.     **Eric Rohr** ("Rohr"), age 53, was the Chief Financial Officer of Live Well from 2008 through his resignation in December 2018.  As the CFO, Rohr oversaw several of Live Well's departments, including financial planning and analysis; accounting; human resources; compliance and risk management; funding, post-closing, and servicing oversight.  Rohr reported directly to Hild.  Rohr became a Certified Public Accountant in 1988 but let his license lapse in 1995.

22.     **Darren Stumberger**, age 46, was an Executive Vice President of Live Well from September 2014 through his resignation in March 2019.  During this time, Stumberger served as the manager of Live Well's bond portfolio.  Stumberger reported directly to Hild and also took direction from the CFO, Rohr.  Stumberger held Series 7 and 63 securities licenses until 2014.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

23.     **Third-Party Pricing Service** (the "Pricing Service") provides valuation services for fixed income and equity securities to investment companies, investment advisers, broker-dealers, financial services companies, insurance companies, banks, trust companies, and other

institutional investors.  The individuals at the Pricing Service to whom Defendants sent the fraudulent valuation information worked in this judicial district.

24.    **Repo Lender 1** is a financial services firm headquartered in Los Angeles, California with offices in this judicial district that provided repurchase financing to Live Well. Live Well regularly communicated with employees of Repo Lender 1 located in this judicial district regarding the transactions at issue in this case.

25.    **Repo Lender 2** is a United States subsidiary of a financial services firm headquartered in Tokyo, Japan with offices in this judicial district that provided repurchase financing to Live Well.  Live Well regularly communicated with employees of Repo Lender 2 located in this judicial district regarding the transactions at issue in this case.

26.    **Repo Lender 3** is a United States subsidiary of a financial services firm headquartered Seoul, South Korea with offices in this judicial district.  Live Well regularly communicated with employees of Repo Lender 3 located in this judicial district regarding the transactions at issue in this case.

27.    **Repo Lender 4** is a United States subsidiary of a banking company headquartered in Beijing, China with offices in this judicial district.  Live Well regularly communicated with employees of Repo Lender 4 located in this judicial district regarding the transactions at issue in this case.

28.    **Live Well Employee 1** was an analyst on the trading desk at Live Well from September 2014 through May 2018.  During this time, Live Well Employee 1 reported to Stumberger and took direction from Stumberger, Rohr, and Hild.  Live Well Employee 1 worked in this judicial district.

29.     **Live Well Employee 2** joined Live Well in January 2016 as a mortgage originator.  Over time, he began to provide periodic support to the trading desk and in February 2017, he became a junior analyst on the trading desk.  Live Well Employee 2 resigned from Live Well in June 2018.

## FACTS

### A.     Live Well's Bond Portfolio

30.     Live Well began operations in 2005 as an originator and servicer of reverse mortgage loans, also known as home equity conversion mortgages ("HECMs").

31.     In September 2014, Live Well added a new line to its business by acquiring a portfolio of approximately 20 bonds called "HECM IOs" (Home Equity Conversion Real Estate Mortgage Investment Conduit, Interest Only).

32.     The value of HECM IOs is tied to the performance of a pool of reverse home mortgage instruments.  The bonds in the portfolio are, in effect, reverse mortgage-backed securities.

33.     Live Well financed the acquisition of HECM IOs through repurchase ("repo") agreements, which are a form of short-term financing (sometimes referred to herein as "loans").  A repo agreement is structured as the sale and repurchase of a security.  In a repo agreement, the seller of a security (sometimes referred to herein as the "borrower") agrees to buy it back from the purchaser (sometimes referred to herein as the "lender," "repo lender," or "repo counterparty") at a specified price and time, and to pay an interest rate when buying the security back.

34.     In determining the purchase price of the bonds that they were willing to buy from Live Well pursuant to a repo agreement, the repo counterparties took the then-current value of the bonds pledged as collateral and applied a discount, or "haircut," of 10 to 20 percent of that value.

35.     Further protecting the repo counterparties is the right to margin-call the borrower. If the value of a bond decreases by a certain dollar amount, as determined by whatever means of valuation Live Well and the repo counterparty mutually agreed upon, then Live Well could be required to post margin (*i.e.*, send a payment to the repo counterparty) in the amount of the decrease in value.  Conversely, if a bond increased in value, the repo counterparty could be required to post margin (*i.e.*, increase the amount of the loan) in the amount of the increase in value.

36.     The purpose of a "haircut" and of margin is to provide the lender a cushion from price fluctuations in the security if it needs to retain and liquidate the collateral in the event of non-payment by the borrower.  Repo lenders regard repo financing to be a relatively low-risk form of lending because the loans are fully secured by collateral that exceeds the value of the credit extended, are insulated from fluctuations in values through the requirement to post margin and the "haircut," and because the loans are short-term.  The lender's goal is to be able to recoup the funds that it has loaned even if the price of the bonds that secure the loan goes down.

37.     Under the repo agreements in this case, Live Well borrowed up to 90 percent of the value of the security it owned or wished to purchase, depending on the repo lender, through short-term loans that were collateralized by the bonds already held or newly purchased by Live Well.

38.     The repo agreements would automatically renew or "roll over" at the end of their stated term, until one of the parties notified the other that it wished to terminate the agreement.

39.     If Live Well failed to pay back the loan or, technically, to repurchase the bonds after receiving notification from the lender that it was terminating the repo agreement at the end of the applicable repo term, the repo lender could seize the bonds.

40.     All but one of Live Well's repo counterparties used the Pricing Service's marks to value the bonds that Live Well used as collateral for obtaining financing.

41.     Many of the bonds in Live Well's portfolio were not initially priced by an independent pricing service.  Because the repo lenders required this before they would lend against a bond, Live Well arranged for the Pricing Service to publish a valuation for each of the bonds in Live Well's portfolio, including the bonds Live Well wished to purchase with repo financing.

42.     As part of this process, Live Well provided the Pricing Service with quotes for the bonds.

43.     Initially, the Pricing Service considered Live Well's submitted quote as just one input in its proprietary evaluation methodology used to determine the price quote delivered to its subscribers.

44.     Between September 2014 and September 2015, Live Well sent quotes to the Pricing Service based on recent trade prices or, in the absence of that data, based on generic, market-based inputs for prepayment speeds, yield curves, and interest rates.

45.     This approach was intended to approximate a "market value" or "exit price" (*i.e.*, the price at which the securities could be sold in the market).

46.     Hild, Rohr, and Stumberger each knew from the outset that the Pricing Service's published valuations were intended to represent the "market value" or "exit price" of each security.

47.     Beginning in January 2015, Live Well began receiving regular margin calls from its repo lenders resulting from small fluctuations in the Pricing Service's values.

48.     The margin calls by the repo lenders, although relatively small, were unpredictable and put a strain on Live Well's liquidity.  Hild resented them because of their impact on Live Well's finances and operations.

49.     Hild instructed Stumberger, Live Well's portfolio manager throughout the relevant period, and the other members of Live Well's trading desk to find a way to stop the Pricing Service's value fluctuations which were triggering the margin calls.

**B.      The Pricing Service Agrees to Publish**
**Live Well's Quotes Verbatim**

50.     In February 2015, after a series of conversations with Live Well regarding the strain of short-term price fluctuations, the Pricing Service agreed to begin publishing the quotes Live Well provided to it without any additional evaluation, rather than the Pricing Service's own independently determined values.

51.     In a February 2015 email received by Hild and Rohr, Stumberger explained:  "We will be supplying prices daily to [the Pricing Service] and [the Pricing Service] will use these… They will use the prices verbatim and not model these bonds until we are interested in them doing so."

52.     Shortly after Stumberger sent this email, Live Well confirmed that the Pricing Service was no longer evaluating the bonds to independently derive their valuations, but was instead accepting and publishing Live Well's quotes "verbatim."

53.     Hild, Rohr, and Stumberger were aware of this change in the Pricing Service valuation practices.

11

54.     As of February 2015, Live Well, Hild, Rohr, and Stumberger knew that all but one of Live Well's repo counterparties relied on the Pricing Service's published values to determine how much the bonds that were the subject of Live Well's repo agreements were worth.

55.     Prior to September 2015, the quotes that Live Well sent to the Pricing Service were typically identical or nearly identical to the actual prices for which Live Well had recently purchased the bonds.

### C.      Live Well Deceives its Lenders and Exposes Them to Hidden Risks

#### 1.      Live Well Fraudulently Inflates the Quotes Sent to The Pricing Service in Order to Obtain Excess Financing

56.     In September 2015, Live Well, at Hild's direction, stopped sending quotes to the Pricing Service representing "market value" or "exit price" of bonds, and, instead, started submitting inflated quotes.

57.     This practice came to be referred to internally at Live Well as "Scenario 14."

58.     Scenario 14 did not rely upon recent market transactions and its objective was not to determine "market value" or "exit price;" instead, it involved a menu of scenarios from which Hild chose based on the aggregate impact on the value of Live Well's HECM IO portfolio, on Live Well's liquidity, and on other considerations unrelated to the market value of the bonds.

59.     For example, if Live Well needed liquidity in order to meet a margin call, Hild would create a scenario that generated the amount of liquidity needed and submit to the Pricing Service the values for the bonds generated by that scenario.

60.     Because the repo lenders did not know that, starting in September 2015, the Pricing Service's published valuations were devised by Live Well and not reflective of market value, the

repo lenders were unknowingly exposed to the risk that the bonds securing their loans would not cover their losses in the event Live Well defaulted on the loans.

61.     After Live Well began using Scenario 14, the quotes that it submitted to the Pricing Service were on average 29 percent higher than Live Well's purchase price, even though Live Well purchased those bonds in arms-length, orderly market transactions.  Many of the inflated quotes were sent in by Live Well the same day that it contracted to purchase the bonds but prior to settlement.  The following table illustrates Live Well's submission of inflated quotes:

| Purchase Date | Bond | Purchase Price | Date of Submission to Pricing Service | Value Submitted | Percentage Inflation in Value |
|---|---|---|---|---|---|
| 9/11/2015 | GNR 2015-H14 AI | 12.8125 | 9/14/2015 | 15.3750 | 20.00% |
| 9/15/2015 | GNR 2013-H08 DI | 10.3906 | 9/15/2015 | 12.0469 | 15.94% |
| 9/15/2015 | GNR 2015-H16 DI | 13.6406 | 9/15/2015 | 16.8750 | 23.71% |
| 9/28/2015 | GNR 2015-H23 AI | 12.4063 | 9/28/2015 | 14.9700 | 20.66% |
| 9/17/2015 | GNR 2015-H12 BI | 12.4531 | 9/18/2015 | 14.7031 | 18.07% |
| 9/21/2015 | GNR 2015-H12 BI | 12.4531 | 9/18/2015 | 14.7031 | 18.07% |
| 9/28/2015 | GNR 2015-H22 CI | 12.7813 | 9/29/2015 | 15.6400 | 22.37% |
| 9/24/2015 | GNR 2015-H17 AI | 13.0000 | 9/25/2015 | 16.0938 | 23.80% |
| 9/24/2015 | GNR 2015-H06 DI | 11.0000 | 9/25/2015 | 14.1875 | 28.98% |
| 9/24/2015 | GNR 2015-H08 BI | 11.4375 | 9/25/2015 | 14.0313 | 22.68% |
| 10/7/2015 | GNR 2015-H08 BI | 11.3438 | 10/12/2015 | 14.6665 | 29.29% |
| 11/4/2015 | GNR 2015-H27 AI | 11.7500 | 11/4/2015 | 14.2500 | 21.28% |
| 11/13/2015 | GNR 2015-H29 JI | 12.1406 | 11/24/2015 | 15.3750 | 26.64% |
| 11/17/2015 | GNR 2015-H29 BI | 11.3125 | 11/24/2015 | 14.5626 | 28.73% |
| 12/1/2015 | GNR 2015-H30 CI | 11.6250 | 12/1/2015 | 15.4375 | 32.80% |
| 12/2/2015 | GNR 2015-H26 BI | 12.1250 | 12/2/2015 | 16.0625 | 32.47% |
| 12/3/2015 | GNR 2015-H28 BI | 9.2500 | 12/3/2015 | 11.8438 | 28.04% |
| 12/30/2015 | GNR 2015-H32 MI | 9.6906 | 12/30/2015 | 12.4375 | 28.35% |
| 12/30/2015 | GNR 2015-H32 AI | 11.9063 | 12/30/2015 | 15.8750 | 33.33% |
| 1/4/2016 | GNR 2015-H33 AI | 12.1094 | 1/4/2015 | 15.8750 | 31.10% |
| 2/25/2016 | GNR 2016-H04 DI | 10.9177 | 2/25/2016 | 14.7813 | 35.39% |
| 3/21/2016 | GNR 2016-H07 KI | 11.0938 | 3/25/2016 | 14.8750 | 34.08% |
| 4/1/2016 | GNR 2016-H07 KI | 11.2813 | 3/25/2016 | 14.8750 | 31.86% |

| 5/5/2016 | GNR 2016-H09 NI | 12.0625 | 5/10/2016 | 16.1894 | 34.21% |
|----------|-----------------|---------|-----------|---------|--------|
| 5/11/2016 | GNR 2016-H11 LT | 1,643.00 | 5/25/2016 | 2123.0938 | 29.22% |
| 5/27/2016 | GNR 2016-H11 LM | 1,608.00 | 5/31/2016 | 2054.0313 | 27.74% |
| 6/8/2016 | GNR 2016-H11 LG | 1,608.00 | 6/8/2016 | 2098.2309 | 30.49% |
| 7/27/2016 | GNR 2016-H16 LX | 1,476.45 | 7/26/2016 | 1930.7500 | 30.77% |
| 8/26/2016 | GNR 2016-H17 AI | 14.4797 | 8/26/2016 | 20.0533 | 38.49% |
| 9/12/2016 | GNR 2016-H11 MI | 11.6875 | 9/12/2016 | 17.0620 | 45.99% |
| 9/29/2016 | GNR 2016-H17 BI | 12.1016 | 9/29/2016 | 17.1250 | 41.51% |
| 9/29/2016 | GNR 2016-H07 GI | 11.0000 | 9/29/2016 | 15.2813 | 38.92% |
| 10/25/2016 | GNR 2016-H23 MI | 15.1250 | 10/26/2016 | 18.2094 | 20.39% |
| 10/28/2016 | GNR 2016-H11 JI | 11.8438 | 10/31/2016 | 14.5313 | 22.69% |
| 11/29/2016 | GNR 2016-H24 BI | 14.2656 | 11/29/2016 | 17.7500 | 24.42% |
| 11/29/2016 | GNR 2016-H23 PI | 11.3281 | 11/30/2016 | 14.5625 | 28.55% |

62.     Based on their understanding that all but one of the repo lenders relied on the Pricing Service's published valuations to value the bonds that comprised the loan collateral, Live Well, Hild, Rohr, and Stumberger knew that by submitting these inflated quotes to the Pricing Service, Live Well could increase the amount it could borrow from the lenders who relied on the Pricing Service.

63.     As Live Well Employee 1, a junior trader who reported to Stumberger, stated in a September 2015 email:  "Basically with [Hild's] new methodology when we buy something, he looks at how much he can immediately write it up and in turn . . . get cash lending against it…."  As a result of the shift to Scenario 14 and relationships with repo lenders that relied on the valuations published by the Pricing Service, Live Well was able to purchase bonds entirely with loan proceeds, *i.e.*, without having to contribute any of its own capital.  In fact, Live Well would typically wind up with surplus loan proceeds that would be available for other business expenses, including compensation.

64.     For example, on September 11, 2015, Live Well entered into an agreement to buy a bond for $12.8125, for a total cost of $12.48 million.  On September 14, 2015, Live Well sent the

Pricing Service a quote for this bond of $15.375—20 percent above the purchase price.  On
September 15, 2015, after confirming that the Pricing Service published Live Well's inflated quote,
Live Well notified one of its repo lenders ("Repo Lender 1"), that it wanted to "add this bond" to
its repo line.

        65.    Relying on Live Well's inflated quote, Repo Lender 1 concluded that the bond was
worth $14.94 million and loaned Live Well $13.45 million (reflecting a 10 percent "haircut")
through a repo agreement.

        66.    For many of the bonds that Live Well already held in its portfolio when it
implemented Scenario 14 in September 2015, Live Well submitted inflated quotes to the Pricing
Service and then extracted additional cash and securities from its repo lenders by issuing margin
calls to those lenders.

        67.    This part of the scheme is succinctly summarized in a January 2016 email from
Live Well Employee 1 to other Live Well employees:  "As it sits in [Pricing Service] right this
second we could harvest 850k.  Depending on which exact prices we want to export itd [sic] be an
additional 3.3-4.2M on top of that."

        68.    In other words, depending on which scenario Hild chose, Live Well could issue a
margin call to Repo Lender 1 for $850,000, $4 million, or $5 million, and could use that cash for
additional bond purchases, to pay compensation, or for any other purpose.

        69.    Live Well stepped up the quotes of many of the bonds that it already held in its
portfolio when it initially implemented Scenario 14 in two or more stages, in order to avoid sudden
large increases that might draw scrutiny from the Pricing Service or from its repo counterparties.

        70.    When initiating margin calls, Live Well at times communicated to its repo lender
that prices Live Well "saw" in the market had increased.  In doing so, Live Well misrepresented

15

that changes in Pricing Service valuations reflected market movements rather than the Pricing Service's mere republication of Live Well's inflated quotes.

71.     Hild directed and/or approved the inputs used to falsely inflate the bond valuations from the inception of the mismarking scheme in September 2015.  Hild knew about and approved virtually every set of quotes that Live Well sent to the Pricing Service, every loan received from the repo lenders based on the quotes, and every margin call to a repo lender.

72.     Rohr and Stumberger knowingly and substantially participated in the scheme to submit false valuations to the Pricing Service in order to increase Live Well's borrowing capacity at Hild's direction.

73.     Stumberger knew that Live Well's Scenario 14 quotes represented a deliberate increase above the "market value" or "exit value" of the bonds.  Stumberger, however, carried out the scheme with Hild by identifying repo counterparties that relied on the values published by the Pricing Service, overseeing the actions of Live Well employees subject to his supervision in furtherance of the scheme, instructing Live Well Employee 2 to randomize marks submitted to the Pricing Service, and otherwise supporting the scheme.  Under Stumberger's supervision, Live Well employees submitted the inflated Scenario 14 quotes to the Pricing Service and the margin calls to the repo lenders.

74.     Rohr was aware of all aspects of the scheme, including the submission of inappropriately inflated quotes to the Pricing Service; the targeting of lenders by Live Well that relied on the inflated quotes published by the Pricing Service; the obtainment of excess borrowing by Live Well from the lenders based on the inflated collateral values; Live Well's use of  the excess borrowing to grow the portfolio and to pay business expenses; and the hidden risks that

Live Well was imposing on its repo counterparties because of their inability to sell the bonds at the inflated prices in the event of default by Live Well.

75.    Rohr, nevertheless, carried out the scheme with Hild.  Rohr communicated Hild's instructions to submit inflated quotes to the Pricing Service to other Live Well employees on multiple occasions, and he also certified false and misleading financial statements of Live Well that he supplied or caused others to supply to the repo counterparties in connection with the lenders' assessment of Live Well's creditworthiness.

76.    At various times, Rohr, Stumberger, and Live Well Employee 1 expressed discomfort to Hild with the shift to Scenario 14 and warned Hild that Live Well would not be able to sell the bonds for the inflated quotes that it was submitting to the Pricing Service.

77.    After switching to Scenario 14 to generate inflated quotes to send to the Pricing Service, Live Well made a point of seeking financing from repo lenders that it knew lacked the internal expertise to value HECM IO bonds and therefore could reasonably be expected to rely on values published by the Pricing Service.

78.    On September 24, 2015, Hild sent an email to the members of Live Well's trading desk asking them for "ideas on what dealers [Live Well] should approach next for repo who will use [the Pricing Service]," and emphasizing, "The key is using [the Pricing Service] for marks."

79.    The repo agreements executed between Live Well and its repo lenders provided that the collateral (*i.e.*, the bonds) would be valued at market value obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source.

80.    Live Well negotiated a provision in an annex to a repo agreement with one of its lenders executed in March 2017 that equated the values published by the Pricing Service with

market value.  The Defendants, however, knew that the Pricing Service's published values for existing and new bonds in Live Well's portfolio exceeded their market value by a substantial amount.

### 2.   Defendants Fraudulently Inflate Bond Prices to Manage Liquidity Events

81.     In early 2017, Live Well, under Hild's direction, responded to unexpected reductions in credit by repo lenders that threatened Live Well's solvency by arbitrarily increasing the already-inflated Scenario 14 marks for its HECM IO bonds.  By doing so, Live Well and Hild were able to fraudulently obtain additional funds from Live Well's repo lenders through margin calls.

### a.   Repo Lender 1 Pulls MACR Financing and Reduces its Credit Line

82.     In late January 2017, Repo Lender 1 informed Live Well that it would no longer provide repo financing for a type of bond called "MACRs" (Modifiable and Combinable REMICs) and that it was reducing its credit line from $210 million to $143 million.

83.     Hild regarded this announcement by Repo Lender 1 as a "catastrophe."

84.     Repo Lender 1's reduction in its credit line threatened Live Well's solvency because (a) Live Well did not have enough cash on hand to repay Repo Lender 1, (b) liquidating the bonds would not generate enough cash to repay Repo Lender 1 because of their inflated value, and (c) refinancing the bonds with another lender at the then-current Pricing Service levels would be cash-negative because Repo Lender 1 applied the smallest "haircut" in the industry.  Hild and Rohr understood these facts.

85.     Hild directed Live Well Employee 1 to submit increased quotes to the Pricing Service "without setting off any tripwires" so that Live Well could issue margin calls to other repo

18

lenders in order to generate cash to repay Repo Lender 1.  Hild directed Live Well Employee 1 to make the increases "incremental" and "not uniform."

86.     In discussing the above directives with Rohr, Hild acknowledged that Live Well's traders would likely be uncomfortable carrying out Hild's instructions.

87.     When it came time to submit the increased quotes to the Pricing Service for the express purpose of generating funds to repay Repo Lender 1, Live Well Employee 1 refused to submit the quotes and took a leave of absence from the company.

88.     In Live Well Employee 1's absence, Stumberger instructed Live Well Employee 2 to prepare and submit the quote increases to the Pricing Service so that Live Well could make margin calls to Live Well's repo lenders.

89.     To avoid attracting attention from the Pricing Service, Stumberger directed Live Well Employee 2 to increase the marks in phases and to make the increases "look random."

90.     In response to Repo Lender 1's stated intention to reduce Live Well's credit, Live Well submitted inflated quotes to the Pricing Service that made it appear that the value of its portfolio had increased by a total of $35.5 million, including $4.2 million on February 3, 2017; $22.9 million on February 6, 2017; $7.3 million on February 8, 2017; and $1.1 million on February 9, 2017.

91.     These increases supplied Live Well with the pretext it needed to margin call several of its repo lenders to obtain funds to offset the decrease in its line of credit by Repo Lender 1.

92.     Defendants knew that no analysis of "market value" was conducted to support these price increases.

**b.** **Live Well Receives a $2 Million Margin Call**

93.     On or around March 17, 2017, Live Well received a margin call from a broker-dealer with which it entered into hedging transactions for approximately $2 million related to Live Well's hedging of treasury securities with that company.

94.     Live Well did not have cash on hand to satisfy the margin call, so Live Well Employee 2 was directed to submit quotes with increased prices to the Pricing Service, and to randomize them so as not to invite scrutiny, in an amount that would enable Live Well to extract enough cash from repo lenders that relied on the Pricing Service's published marks to repay the broker-dealer.

95.     Live Well Employee 2 disregarded the directive to randomize the quotes and instead submitted marks to the Pricing Service that increased the price of five bonds by $1 and one bond by $.50.

96.     Defendants knew that there was no analysis of "market value" to support these quotes and that the "round number" price increases were submitted solely for the purpose of obtaining additional loan proceeds to which Live Well was not entitled.

97.     Defendants also knew that the bond prices submitted to the Pricing Service were calculated specifically to offset the hedge-related margin call from Live Well's broker-dealer counterparty.

**c.** **Repo Lender 2 Terminates**
**its Repo Agreements with Live Well**

98.     In mid-March 2017, Repo Lender 2 informed Live Well that it was terminating its line of credit.

99.     At the time, Live Well had 12 bonds on repo with Repo Lender 2, against which it had borrowed approximately $92 million.

100.    If Live Well could not find alternative financing for these bonds, it faced possible insolvency because Live Well did not have cash on hand to repay Repo Lender 2 and the bonds comprising the collateral for the loans were worth substantially less than the loan balance as a result of Live Well's inflating the bond prices during the course of the mismarking scheme.

101.    Once again, Live Well responded in part by arbitrarily increasing the values of the quotes sent to the Pricing Service.

102.    On March 24, 2017, Live Well sent quotes to the Pricing Service that increased the values of 27 bonds by exactly one dollar each without conducting any valuation analysis.

103.    Hild was aware of the increases in the quotes and the absence of analytics to support them.

104.    As a result of the increased quotes, the apparent market value of Live Well's HECM IO portfolio, based on the new Pricing Service levels, increased by more than $19 million overnight, creating the pretext for Live Well to issue margin calls to certain repo lenders to access additional cash.

105.    Rohr informed Hild that he was unwilling to incorporate into Live Well's financial statements the arbitrarily inflated values submitted to the Pricing Service designed to enable Live Well to survive the liquidity shocks brought about by the actions of certain repo lenders.  Rohr did not want to use the inflated values for purposes of Live Well's books because they lacked even the pretense of analysis.  Hild initially resisted, but ultimately agreed not to incorporate the inflated values into Live Well's financial statements.

### 3.    Live Well Submits False and Misleading Financial Statements to its Lenders in Furtherance of the Scheme

106.    Though the collateral pledged, the "haircuts," and the margin posted were designed to protect Live Well's repo counterparties, the lenders also considered Live Well's

creditworthiness and financial state in determining whether to lend money to it.  Accordingly, the repo counterparties gave significant consideration to the claims made in Live Well's financial statements about its finances, its approach to valuation, and the total value of its bond portfolio and its assets.

107.    Because the financial statements, with limited exceptions, used the same inflated bond values that Live Well had submitted to the Pricing Service, Live Well's financial statements from 2015 through 2018 falsely overstated the value of its bond portfolio (and, consequently, its total assets) by a substantial amount.

108.    Throughout the relevant period, Live Well's financial statements expressly stated that Live Well valued its portfolio according to its bonds' "exit price" and that Live Well "carries these securities at fair value derived from an independent third-party pricing service."

109.    As of February 2015 and thereafter, however, Live Well, Hild, and Rohr knew that the Pricing Service was simply acting as a pass-through for the quotes that Live Well submitted to it; as of September 2015 and thereafter, Live Well, Hild, and Rohr knew that Live Well's bonds were not valued at "exit price" in its financial statements.

110.    Throughout the relevant period, Hild and Rohr falsely attested to the fair presentation of Live Well's financial statements.  Hild and Rohr knew that Live Well provided financial statements to the repo lenders for them to consider in determining Live Well's creditworthiness.

**D.    The Defendants Fear Exposure of the Scheme and Discuss Possible Ways to Minimize that Risk**

111.    On January 12, 2017, an employee of Repo Lender 1 asked a Live Well employee to identify one or more dealers through which Repo Lender 1 could spot check the prices of the bonds serving as collateral for the repo financing that Repo Lender 1 had extended to Live Well.

112.     The request from the employee of Repo Lender 1 triggered an emergency meeting between Hild and others at Live Well, during which the participants expressed great apprehension about the consequences for Live Well if Repo Lender 1 learned that the Pricing Service was simply publishing verbatim values that had been submitted to it by Live Well and that these valuations substantially exceeded market value.

113.     Hild and the other participants in the meeting discussed how to respond to the employee of Repo Lender 1 in such a way that would minimize the chances of Repo Lender 1 discovering these facts.

114.     During the meeting, Stumberger stated, "[T]he scariest scenario obviously is, you know, Scott gets the color, he calls up [Pricing Service], he's like [Pricing Service], the dealers are, you know, I checked with a dealer and the dealer said this is 7 points lower and some $30,000 person clerk at [Pricing Service] says, well this—these come from broker quotes.  He's gonna say, who's the broker.  I don't know if [Pricing Service] isn't—you know, can disclose that or not. Then that gets even hairier."

115.     Rohr's suggestion to Hild was to find a dealer "who'd be willing to be slimy for you" by corroborating the inflated bond prices that Live Well submitted to the Pricing Service. Rohr stated, "I feel like I'm about to throw up right now so that's the only thing that comes to my mind."

116.     During the meeting, Hild acknowledged that if the employee of Repo Lender 1 was "looking for someone to say, tell me what [the bonds] trade at, then they're going to give him a different number.  Right?  Which I think is what he's looking for."

117.     During the meeting, Stumberger stated that Repo Lender 1 only "cares about what is the market," to which Hild responded, "There's no debating that."

118.     In a follow-up meeting the next day, Hild said he feared that introducing the lender to a certain dealer in order to spot check the price of a bond might let "the genie out of the bottle."

### E.     Live Well Balloons the Size of its Portfolio and the Corresponding Remittance Payments as a Result of the Bond Mismarking Scheme

119.     Hild described the bond mismarking scheme as "a self-generating money machine."  This description was apt, in that virtually every bond purchase by Live Well following its implementation of the scheme was fully covered by the loan proceeds, and, in fact, generated extra cash for Live Well.  Consequently, Live Well went on a buying spree and its bond portfolio ballooned from a value of $71 million to more than $570 million—as reported by Live Well—in just 18 months.

120.     In the eight months ending in September 2015, before Live Well implemented the Scenario 14 scheme, its bond portfolio grew relatively modestly from $50 million to $71 million (as reported by Live Well).  In the eight months following September 2015, however, the portfolio jumped from $71 million to $324 million (as reported by Live Well).

121.     Live Well's revenues from the bonds' remittances increased proportionately as it added bonds to the portfolio, at times netting Live Well more than $5 million monthly in cash.

122.     During the relevant period, Live Well borrowed tens of millions of dollars more from its repo lenders than it would have been able to borrow had Live Well not submitted inflated quotes for the bonds in its portfolio to the Pricing Service, knowing that they would be passed on to the repo lenders.

123.     The repo lenders would not have knowingly extended financing to Live Well based on collateral that was valued by Live Well, rather than the Pricing Service, or based on Pricing Service values that exceeded market value.  Nor would the lenders have extended credit to Live

Well if they knew that Live Well's financial statements contained false and misleading statements concerning the value of its assets, including its bond portfolio, and Live Well's methods of determining the value.

### F.   Live Well and Hild Make Millions from the Bond Pricing Fraud

124.   As a result of the rapid growth of Live Well's HECM IO portfolio made possible by the mismarking scheme, Hild received at least $24 million in additional salary, bonuses and other special compensation.

a.   In 2014, before the mismarking scheme began, Hild received cash compensation of **$850,000**, consisting of $250,000 in salary and $600,000 in bonus.

b.   In 2015, Hild received cash compensation of **$1,450,000**, consisting of $250,000 in salary and $1,200,000 in bonus.

c.   In 2016, Hild received cash compensation of **$5,032,980**, consisting of $250,000 in salary, $3,287,500 in bonus, and guaranty fees of $1,495,480.

d.   In 2017, Hild received cash compensation of **$9,724,026**, consisting of $1,242,499 in salary, $2,207,500 in bonus, and guaranty and director fees of $6,274,027.

e.   From 2018 to the present, Hild received cash compensation of **$10,966,406**, including $1,826,270 in salary and guaranty and director fees of $9,140,136.

125.   The approval of the payments to Hild referenced in the preceding paragraphs was based in large part on the rapid growth in Live Well's revenue, net income, and total assets.  Live Well achieved this growth wholly or substantially by fraudulently inflating the value of the bonds in Live Well's HECM IO bond portfolio.

126.   In the eight months before implementing the mismarking scheme (January 2015 through August 2015), Live Well's HECM IO bond portfolio generated approximately $5.6 million

in revenue, or about $700,000 per month, in the form of cash remittance payments due as interest on the bonds.

127.    After the implementation of the mismarking scheme, Live Well's HECM IO bond portfolio generated over $100 million from cash remittance payments:

    a.  From September 2015 through April 2016, the bond portfolio generated approximately $14.2 million in revenue, or an average of approximately $1.8 million per month;

    b.  From May through December 2016, the bond portfolio generated approximately $30.8 million in revenue, or an average of approximately $3.8 million per month;

    c.  From January through August 2017, the bond portfolio generated approximately $43.1 million in revenue, or an average of approximately $5.4 million per month;

    d.  From September 2017 through April 2018, the bond portfolio generated approximately $36.8 million in revenue, or an average of approximately $4.6 million per month.

128.    Hild used a portion of the cash flows generated from the mismarking scheme to buy out preferred shareholders in September 2016.  This resulted in Hild becoming the majority shareholder of Live Well and controlling one of two board seats.

129.    By buying out the preferred shareholders and controlling one of two Live Well board seats, Hild was able to ensure approval of his compensation increases and other payments to him from the company.

130.    Hild also authorized additional compensation to Rohr and Stumberger as a result of the scheme.

**G.    Live Well's Fraudulent Bond Pricing Scheme Collapses**

131.    By March 2018, the financing for Live Well's portfolio of HECM IO bonds had shifted to just two repo lenders, Repo Lender 3 and Repo Lender 4.

132.    In the fall of 2018 and spring of 2019, Repo Lender 3 and Repo Lender 4, respectively, sought to verify the values upon which their financing to Live Well was based.

133.    Repo Lender 3 and Repo Lender 4 independently determined that the bonds were worth much less than values published by the Pricing Service.

134.    Repo Lender 3 and Repo Lender 4 separately informed Live Well that they wanted to discontinue the financing to Live Well.

135.    Live Well responded that it lacked the liquidity to repay the lenders.

136.    Live Well tried various ways to avoid being held in default by the lenders, including taking a small number of the bonds back and promising that the sale of its mortgage servicing business would generate ample liquidity.

137.    Live Well's sale of its mortgage servicing business did not generate sufficient liquidity to repurchase the bonds upon which the financing from Repo Lender 3 and Repo Lender 4 were based, and the overwhelming majority of the bonds remained on repo with the lenders.

138.    On May 3, 2019, Live Well announced that it was winding down its operations and terminating all of its employees.

139.    In its May 2019 financial statements, Live Well wrote down the mark-to-market value of its portfolio by $141 million.

140.    On July 1, 2019, Live Well was placed into involuntary Chapter 7 bankruptcy at the request of Repo Lender 3, Repo Lender 4, and a bank that had extended a "bond-secured" credit line to Live Well.

141.    In the bankruptcy pleadings, Live Well's lenders alleged losses in excess of $130 million in connection with Live Well's mismarking scheme, including at least $60 million in losses to Repo Lender 4 and at least $22 million in losses to Repo Lender 3.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against Live Well, Hild, Rohr, and Stumberger)

142.    Paragraphs 1 through 141 are realleged and incorporated herein by reference.

143.    Defendants Live Well, Hild, Rohr, and Stumberger, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

144.    By reason of the foregoing, Live Well, Hild, Rohr, and Stumberger, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and (3)]
### (Against Live Well, Hild, Rohr, and Stumberger)

145.    Paragraphs 1 through 144 are realleged and incorporated herein by reference.

146.    Defendants Live Well, Hild, and Rohr, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or

communication in interstate commerce or by the use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

147.    By reason of the foregoing, Live Well, Hild, and Rohr, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

148.    Defendant Stumberger, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

149.    By reason of the foregoing, Stumberger, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a), (b), and (c) thereunder
### [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(a), (b), and (c)]
### (Against Live Well, Hild, Rohr, and Stumberger)

150.    Paragraphs 1 through 149 are realleged and incorporated by reference herein.

151.    Defendants Live Well, Hild, and Rohr, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or

indirectly, (a) employed a device, scheme, and artifice to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or a course of business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or prospective purchasers of securities.

152.    By engaging in the conduct described above, Live Well, Hild, and Rohr violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

153.    Defendant Stumberger, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, employed a device, scheme, and artifice to defraud, and engaged in acts, practices, or a course of business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or prospective purchasers of securities.

154.    By engaging in the conduct described above, Stumberger violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

## <u>COUNT IV – CONTROL PERSON LIABILITY (FRAUD)</u>

### Violations of Section 20(a) of the Exchange Act
### [15 U.S.C. § 78t(a)]
### <u>(Against Hild)</u>

155.    Paragraphs 1 through 154 are realleged and incorporated by reference herein.

156.    At all times relevant hereto, Defendant Hild controlled Live Well for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

157. By engaging in the conduct alleged above, Defendant Hild is liable as a control person for Live Well's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT V – AIDING AND ABETTING (FRAUD)

**Aiding and Abetting Violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder
[17 C.F.R. § 240.10b-5(a), (b), and (c)]
(Against Hild, Rohr, and Stumberger)**

158. Paragraphs 1 through 157 are realleged and incorporated by reference herein.

159. As alleged above, Live Well violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

160. Defendants Hild, Rohr, and Stumberger knew, or recklessly disregarded, that Live Well's and/or the other defendants' conduct was improper and knowingly rendered to Live Well and/or the other defendants substantial assistance in their illegal conduct as described above.

161. By reason of the foregoing, Defendants Hild, Rohr, and Stumberger aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## PRAYER FOR RELIEF

The Commission respectfully requests that this Court:

1.      Find that Defendants committed the violations alleged herein;

2.      Permanently enjoin Defendants and each of their agents, employees, and attorneys, and any other person or entity in active concert or participation with them who receives actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

3.      Order Defendants Hild, Rohr, and Stumberger to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus prejudgment interest;

4.      Order Defendants Hild, Rohr, and Stumberger to pay civil penalties pursuant to, as applicable, Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court;

5.      Issue an Order pursuant to, as applicable, Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], and the inherent equitable powers of this Court, permanently prohibiting Defendants Hild and Rohr from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act;

6.      Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

**7.**      Order such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## <u>JURY TRIAL DEMAND</u>

The Commission demands a trial by jury on all issues that may be so tried.

Dated: August 29, 2019                  Respectfully submitted,

*/s/ Robert K. Gordon*
Robert K. Gordon*
Harry B. Roback*
Gregory F. Smolar*

*Application for admission *pro hac vice* forthcoming

U.S. Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
(404) 842-7652 (Gordon)
gordonr@sec.gov